UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GALIOTO TOWING LLC,

        Plaintiff,

v.                                                                     Case No. 21-cv-1163-bhl

THE HUNTINGTON NATIONAL BANK, et al.,

        Defendants.

---

## ORDER GRANTING SUMMARY JUDGMENT

---

        In 2017 and 2019, Plaintiff Galioto Towing LLC (Galioto) purchased two tow trucks with financing from Defendant Huntington National Bank (Huntington).[1] When Galioto failed to make the payments required under the promissory notes it signed in connection with that financing, Huntington arranged for TFS Recovery, Inc. (TFS) to repossess the trucks. Repossession of the first truck did not go smoothly and Galioto filed this lawsuit in state court against both Huntington and TFS for unlawful repossession. Huntington removed the case to this Court and answered, denying Galioto's allegations and asserting counterclaims for breaches of the promissory notes and replevin of the second truck, along with indemnification and contribution crossclaims against TFS. (ECF No. 4.) Huntington also filed a third-party complaint against Galioto's president, Nicholas Bautz, to enforce a personal guaranty Bautz provided for loans made to Galioto. (ECF No. 13.) Huntington now moves for summary judgment on its counterclaims and third-party complaint. (ECF No. 25.) Because the undisputed facts confirm that Galioto breached its contracts with Huntington and that Bautz guaranteed Galioto's performance, Huntington's motion will be granted.

---

[1] On June 9, 2021, Huntington merged with TCF National Bank (TCF). The transactions at issue involved TCF Equipment Finance, a division of TCF that is now merged into Huntington. For ease of reference, the Court will refer to the current defendant and its predecessors at TCF as Huntington.

# FACTUAL BACKGROUND[2]

Galioto is a towing company with its principal place of business in Waukesha, Wisconsin. (ECF No. 1-11 ¶1.) On July 11, 2017, Galioto purchased a tow truck—a "2017 Dodge 4500" and "Century 301 Wrecker"—with financing from Huntington (then TCF). (ECF No. 34 ¶24.) In connection with the purchase, Galioto signed and delivered to Huntington a promissory note, identified as Contract No. 8-501, and a corresponding Security Agreement that granted Huntington a security interest in the vehicle. (*Id.* ¶¶23–24.) Under the promissory note, Galioto agreed to make 72 monthly payments of $1,577.45 starting on September 10, 2017. (*Id.* ¶26.)

On March 18, 2019, Galioto purchased a second tow truck—a "2018 Kenworth Construction T270" and "Chevron 21"—again with financing from Huntington. (*Id.* ¶¶4–5.) As with its earlier purchase, Galioto signed and delivered to Huntington a promissory note, this time identified as Contract No. 8-504, and a corresponding Security Agreement that granted Huntington a security interest in the second vehicle. (*Id.* ¶¶4–6.) Under the promissory note for Contract No. 8-504, Galioto agreed to make 72 monthly payments of $2,045.27 starting on April 29, 2019. (*Id.* ¶¶8, 12.)

On October 14, 2016, prior to both truck purchases, Nicholas Bautz (Bautz) agreed to guarantee Galioto's obligations to TCF/Huntington. (*Id.* ¶¶1–2.) Under the written guaranty, Bautz agreed to "unconditionally and absolutely guarantee[] the full and prompt payment and performance when due (at maturity, by acceleration, or otherwise) of all payments, rents, debts, liabilities and other obligations of every type and description of [Galioto] to [Huntington]." (ECF No. 13-1.)

In February 2020, Galioto began falling behind on its payments to Huntington under both Contract No. 8-501 and Contract No. 8-504. (ECF No. 34 ¶¶9, 27.) In response, on May 19, 2020, the parties agreed to amend the payment schedules on both contracts to allow Galioto additional time to make payments. (*Id.* ¶¶10, 28.) Under the amendment, Galioto was allowed to skip three monthly payments on Contract No. 8-501 and four monthly payments on Contract No. 8-504, with additional payments added to the end of both contracts. (*Id.* ¶¶11–12, 29.)

As the COVID-19 pandemic continued, so did Galioto's financial struggles. (*See* ECF No. 41 ¶5.) After further discussions, on August 10, 2020, the parties agreed to amend the payment terms a second time, allowing Galioto to skip additional payments on both contracts. (ECF No.

---

[2] The facts are drawn from the parties' proposed statements of undisputed facts (and responses). (ECF Nos. 34 & 41.)

34 ¶¶13–15, 30–31.) Again, the payment schedules were adjusted to add additional payments to make up for the missing payments on both contracts. (*Id.*)

Even with these accommodations, Galioto's payment failures continued. (*Id.* ¶¶18, 34.) Galioto made just one partial payment of $2,500 toward its obligations under Contract No. 8-504 after August 2020. (*Id.* ¶18.) Its performance on Contract No. 8-501 was even worse; it made a single payment of only $493.03 on that promissory note on November 2, 2020. (*Id.* ¶34.)[3]

Despite Galioto's repeated payment failures, Huntington did not immediately institute collection and repossession proceedings. Instead, it continued discussions with its counterparty, exchanging voicemails with Galioto in October 2020. (ECF No. 41 ¶12.) During these discussions, Galioto and Bautz repeatedly told Huntington representatives that "catch-up" payments or proceeds from the sale of collateral were forthcoming. (ECF No. 34 ¶42). These "the-check-is-in-the-mail" assurances never proved true. (*See id.* ¶43.) But Galioto and Bautz continued to assure Huntington that further payments were on the way in the hopes that Huntington might agree to a third accommodation. (*See id.* ¶44.) In response, in December 2020, Huntington representatives indicated they would consider a third modification but would need Galioto to provide additional financial information. (ECF No. 41 ¶19.) When Galioto did not provide the requested information, Huntington's patience came to an end. On February 8, 2021, Huntington sent formal loan default notices to Galioto on both contracts. (ECF No. 34 ¶17.)

Notwithstanding the default notices, Galioto tried to stave off repossession. (*See* ECF No. 41 ¶23.) Huntington responded by informing Galioto that it needed "the docs" by February 26, 2021 to "start the review process." (*Id.* ¶24.) Galioto replied with more promises of additional payments, suggesting in a March 19, 2021 email that it would send Huntington $15,000. (*Id.* ¶26; ECF No. 34 ¶43.) But Galioto again failed to follow through, making only a single $2,500 payment on March 24, 2021. (ECF No. 34 ¶34.)

A week later, on April 1, 2021, Huntington repossessed the 2019 Kenworth truck and sold it in a private sale for $73,000. (*Id.* ¶¶19, 21.) The events surrounding the repossession are disputed. According to Galioto, the repossession was so violent that a Galioto employee thought that the repossession agent was a car thief. (ECF No. 41 ¶¶37–38.) Thereafter, Galioto refused to surrender the second vehicle. (ECF No. 34 ¶36.)

---

[3] As discussed below, Galioto later made another $2,500 payment, but only after Huntington declared a default. (ECF No. 34 ¶34.)

According to Huntington, as of September 1, 2022, Galioto still owed $62,530.43 on Contract No. 8-504, after accounting for the principal, late charges, repossession charges, interest, and sales proceeds. (*Id.* ¶22.) It owed $67,829.75 on Contract No. 8-501, as of the same date. (*Id.* ¶37.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To survive a properly supported summary judgment motion, the opposing party must "submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting Fed. R. Civ. P. 56(e)). If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

"[W]hen [a party] moves for summary judgment on an entire claim, it is necessarily also moving for summary judgment on any affirmative defenses to that claim." *United Cent. Bank v. Wells St. Apartments, LLC*, 957 F. Supp. 2d 978, 987 (E.D. Wis. 2013). Therefore, the party opposing summary judgment must "come forward with evidence showing the existence of a genuine factual dispute concerning an affirmative defense that, if ultimately successful, would defeat the claim." *Id.* at 987–88.

## ANALYSIS

Huntington seeks summary judgment on its third-party and counterclaims for breach of contract against Bautz and Galioto, as well as an order of replevin for the 2017 Dodge vehicle that remains in Galioto's possession. Galioto counters with a list of defenses that it insists preclude

summary judgment. (*See* ECF No. 33.) Huntington insists that these affirmative defenses are without merit and do not defeat its motion. (*See* ECF No. 26 at 10–16.) Looking at the facts in the light most favorable to Galioto and applying Minnesota law, which the parties agree govern all claims, Huntington has the better of the argument. The record confirms that Huntington has carried its summary judgment burden, while Galioto has failed to submit sufficient evidence to create a genuine dispute of material fact on any of the claims or defenses presented. Accordingly, Huntington is entitled to judgment as a matter of law and its motion will therefore be granted.

I. **It Is Undisputed that Galioto Breached Contract 8-501 and Contract 8-504.**

Huntington insists it is entitled to summary judgment on its breach of contract counterclaims against Galioto. (ECF No. 26 at 6.) Under Minnesota law, a breach-of-contract claim requires proof of the following elements: "(1) formation of a contract, (2) performance [by party claiming breach] of any conditions precedent to his right to demand performance by [breaching party], and (3) breach of the contract." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). A counterparty's "[f]ailure to perform under a contract when performance is due establishes an immediate breach." *Id.* at 837. And "[a] breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of the contract." *Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank, N.A.*, 193 F. Supp. 3d 1002, 1013 (D. Minn. 2016) (quoting *Lyon Fin. Servs., Inc., v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014)).

    A. **Huntington Has Carried Its Initial Burden of Demonstrating Galioto's Breach of Contract.**

Huntington contends the undisputed facts confirm all elements of its breach of contract claims. In particular, it argues it is uncontested that: (1) the parties entered into two enforceable contracts, Contract 8-501 and Contract 8-504; (2) Huntington performed its obligations by financing the purchase of the two tow trucks; and (3) Galioto breached its contractual obligations by failing to make the required payments. (ECF No. 26 at 6–9; ECF No. 34 ¶¶4–7, 25–26.) Galioto cannot and does not dispute any of this. Huntington has thus carried its initial summary judgment burden. *See Siegel*, 612 F.3d at 937.

    B. **Galioto Has Failed to Carry Its Burden to Create Issues of Fact on Its Affirmative Defenses.**

Unable to dispute its breach, Galioto instead tries to avoid summary judgment based on its affirmative defenses. With respect to those defenses, Galioto has the burden of showing "the

existence of a genuine factual dispute concerning an affirmative defense that, if ultimately successful, would defeat [Huntington's breach of contract] claim." *United Cent. Bank*, 957 F. Supp. 2d at 987–88.

Galioto's answer pleads six affirmative defenses: (1) failure to mitigate damages, (2) unclean hands, (3) estoppel "from making any claims as alleged," (4) failure to comply with condition precedent, (5) failure to act in commercially reasonable manner, and (6) offset. (ECF No. 17 at 5.) Its summary judgment opposition materials are silent on the second and fourth defenses, both of which are therefore waived. *See De v. City of Chicago*, 912 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Failure to set forth any evidence or to develop any arguments in opposition to the moving party's summary judgment motion results in waiver of the nonmoving party's arguments and an abandonment of his claims.") (citing *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 2003)). Because the record does not support application of the four remaining defenses, Galioto's gambit to avoid summary judgment fails.

### 1. Galioto Has Not Come Forward with Evidence Sufficient to Support a Finding that Huntington Failed to Mitigate Its Damages.

Galioto argues that Huntington's bid for summary judgment fails because issues of fact remain on Galioto's contention that Huntington failed to mitigate its damages. More specifically, Galioto contends that a jury could find that Huntington failed to mitigate when it refused to acquiesce to Galioto's demands for a third set of loan modifications. (ECF No. 33 at 5–6.)[4] Huntington maintains it is undisputed that it did in fact reasonably mitigate its damages. (ECF No. 26 at 10–11.)

A non-breaching party's failure to mitigate can be a defense to contract damages. A parties' damages for breach of contract generally require paying the amount required to make the wronged party whole again. *See EnComm Midwest, Inc. v. Larson*, No. A07-2337, 2009 WL 173318, at *5 (Minn. Ct. App. Jan. 27, 2009) (citing *Peters v. Mut. Benefit Life Ins. Co.*, 420 N.W.2d 908, 915 (Minn. Ct. App. 1988)). The non-breaching party has an affirmative duty to use reasonable diligence and good efforts to mitigate or minimize its damages. *Duetz-Allis Credit Corp. v. Jensen*, 458 N.W.2d 163, 166 (Minn. Ct. App. 1990); *Bass v. Equity Residential Holdings, LLC*, 849 N.W.2d 87, 92 (Minn. Ct. App. 2014). The scope of the duty to mitigate depends on the

---

[4] Galioto also argues that Huntington failed to mitigate because its private sale of the 2019 Kenworth truck that it successfully repossessed was not commercially reasonable. (ECF No. 33 at 8–9.) That argument is addressed in Section 4 below.

nature of the contractual obligation and the contract's intended purpose. *Larson*, 2009 WL 173318, at *5. As the party alleging a failure to mitigate, Galioto has the burden of showing that Huntington failed to mitigate its damages. *See Lanesboro Produce & Hatchery Co. v. Forthun*, 16 N.W.2d 326, 328 (Minn. 1944).

Galioto's primary mitigation argument is that Huntington improperly refused to modify the parties' agreements (for a *third time*). In certain cases, entry into a new contract may be required if it would be a reasonable way to mitigate damages. *DeRosier v. Util. Sys. of Am., Inc.*, 780 N.W.2d 1, 7 (Minn. Ct. App. 2010). But this is the exception, not the rule. A breaching party cannot force its counterparty to modify the performance terms set forth in their contract. Indeed, the nonbreaching party "may generally decline the offer [to enter into a new contract] and still recover its full damages." *Id.* A rule to the contrary would allow a breaching party to avoid complying with its commitments and avoid any claim for breach by demanding ongoing renegotiation of the parties' bargain. This would turn contract law on its head.

As a matter of law, Huntington was certainly free to provide Galioto with the possibility of entering into a third loan modification in December 2020. It also had the right to ask Galioto to provide bank statements and other financial information so it could evaluate that potential modification. (ECF No. 41 ¶19.) But Huntington was not required, by a duty to mitigate or otherwise, to commit to any further modification or to engage in perpetual negotiations with its breaching counterparty. *See DeRosier*, 780 N.W.2d at 7. Moreover, the record confirms that it was Galioto's continued failure to live up to its promises that led Huntington not to provide a further accommodation. Huntington finally declared a default only *after* Galioto had repeatedly failed to provide the documentation that Huntington requested as part of considering a further accommodation. (ECF No. 41 ¶¶22, 24.) In these circumstances, Huntington's rejection of Galioto's request for yet another modification is not a failure to mitigate. *See Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, No. 09-CV-3037 (SRN/LIB), 2014 WL 12597430, at *9 (D. Minn. Mar. 11, 2014) ("[A] party that alleges its contract has been breached is not obligated to accept some other, less valuable, performance proposed by the breaching party, and the rejection of such an offer cannot possibly establish a viable mitigation defense.") (collecting cases). The law does not require a non-breaching party like Huntington to assume more risk in order to mitigate its damages. *See id.* at *10 (citing Restatement (Second) of Conts. § 350 cmt. e (Am. L. Inst. 1981)).

Galioto also takes issue with Huntington's "fail[ure] to accept payments of nearly 10% of the total owed" prior to repossessing the truck. (ECF No. 33 at 6.) But Galioto both misunderstands the law on mitigation and misstates the record of its own conduct. Even if, in some circumstances, a refusal to accept a partial payment might raise issues of mitigation, that refusal would at most entitle Galioto to a reduction in the total damages due Huntington; it would not defeat Huntington's claims for breach. Moreover, the record confirms that Galioto never actually sent Huntington the payment it claims Huntington failed to accept. Galioto merely proposed that it could send $15,000 if Huntington were to "work to modify the loan." (ECF No. 41 ¶26.) And then, like many of its other promises and proposals, Galioto failed to follow through. This scenario is not a failure to mitigate. Galioto was not entitled to condition already overdue payments on Huntington accepting further modifications to the parties' payment terms and then, when the amendments never came to be, claim a failure to mitigate. The law required Huntington to use "reasonable diligence to mitigate damages." *Jensen*, 458 N.W.2d at 166. The undisputed facts show that it did so.

### 2. Galioto's Estoppel Defense Does Not Defeat Huntington's Motion.

Galioto also argues that summary judgment should be denied on estoppel grounds. More specifically, Galioto contends Huntington should be estopped from repossessing its collateral because it promised to consider Galioto for a third loan modification.[5] (ECF No. 33 at 6–8.) Huntington contends estoppel does not defeat its claims. (ECF No. 26 at 12–13.)

As an initial matter, Galioto's estoppel arguments are confusing. Its briefing appears to conflate equitable estoppel and promissory estoppel, but the two are distinct doctrines. Under Minnesota law, promissory estoppel *implies* a contract where none exists. Promissory estoppel arises where there is (1) a clear and definite promise that (2) was intended by the promisor to induce reliance, (3) such reliance occurred, and (4) enforcement of the promise is necessary to prevent injustice. *See Gen. Mktg. Servs., Inc., v. Am. Motorsports, Inc.*, 393 F. Supp. 2d 901, 908 (D. Minn. 2005) (citing *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 152 (Minn.

---

[5] It is not entirely clear whether Galioto has sufficiently raised promissory estoppel (or estoppel of repossession of the truck) as an affirmative defense in its answer. Galioto pleads that "Huntington may be estopped from making any claims as alleged in the counterclaims." (ECF No. 17 at 5.) Affirmative defenses "must ordinarily be included in the defendant's answer but 'a delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result.'" *Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009) (citation omitted) (quoting *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005)). Huntington itself does not object on this ground. Because the defense lacks merit in any event, the Court will analyze the defense on the merits.

2001); *Froelich v. Aspenal, Inc.*, 369 N.W.2d 37, 39 (Minn. Ct. App. 1985)). Estoppel is a different equitable doctrine, based on a party's conduct, not a promise. It is used "to prevent a party from taking unconscionable advantage of its own wrong." *Noske v. Noske*, 73 F. Supp. 2d 1025, 1028–29 (D. Minn. 1999) (citing *Plymouth Foam Prods. v. City of Becker*, 120 F.3d 153, 156 (8th Cir. 1997)). Equitable estoppel is applied against a party whose voluntary conduct leads another person, in good faith, to act or take a position to his detriment. *Id.* In these circumstances, the actor is precluded, both at law and in equity, from asserting rights against the other party if that other party has in good faith relied upon the actor's conduct. *Id.*

Galioto's arguments implicate promissory, not equitable, estoppel. It contends it relied on Huntington's *promise* that it would consider Galioto for a third loan modification. (*See* ECF No. 33 at 6.) According to Galioto, because of this promise, it stopped its own efforts to sell trucks, offered to pay Huntington $15,000, and continued to work with Huntington on a potential third loan modification. (*Id.*) Huntington counters that it did not promise Galioto anything; it merely discussed a further potential accommodation and told Galioto that it needed specific documents to even consider yet another change to the required payment terms. (ECF No. 26 at 12–13.) Huntington also characterizes Galioto's behavior as stringing it along "with promises of catch-up payments" that "[n]ever materialized." (*Id.* at 12.)

To defeat summary judgment based on a promissory estoppel defense, Galioto must show that (1) Huntington made a clear and definite promise, (2) Huntington intended to induce reliance, (3) Galioto in fact relied on Huntington's promise to its detriment, and (4) circumstances require enforcement of the promise to prevent injustice. *See Martens v. 3M*, 616 N.W.2d 732, 746 (Minn. 2000). The promise must be "sufficiently clear and definite to be enforceable" and to "reasonably expect to induce reliance." *Id.* The promise must also be one that "the promisor should reasonably expect to induce action or forbearance on the part of the promisee." *Id.* Promissory estoppel is not a substitute for consideration, "but rather [i]s a doctrine based on reliance that the courts could use to prevent injustice." *Olson*, 628 N.W.2d at 151.

Galioto relies on the Minnesota Supreme Court's decision in *Cobb v. Midwest Recovery Bureau Co.*, 295 N.W.2d 232 (Minn. 1980), an opinion that Galioto itself admits may no longer be viable. (ECF No. 33 at 7 n.7.) In *Cobb*, Defendant Mack Financial Corporation repossessed Plaintiff William Cobb's truck after Cobb failed to make timely payments on an installment contract. *Id.* at 233. The parties agreed to multiple extensions, but the debtor's payment failures

continued. *Id.* at 234. The creditor made several threats to terminate the financing, but continued to accept late payments, never actually declared a default, and never suggested that it might repossess the collateral. *Id.* Then, three months after accepting late payments and with the debtor only two payments behind and with only $2,000 in payments remaining, the creditor abruptly and without notice repossessed the truck. *Id.* Even worse, the repossession agent damaged the truck during the repossession and then failed to secure the vehicle, leading to a loss of the debtor's personal property. *Id.* at 234–35. The Minnesota Supreme Court affirmed a trial court's order holding the creditor liable for wrongful repossession. *Id.* at 235, 237. It held that the creditor was estopped from asserting its contract rights given its repeated acceptance of late payments. *Id.* at 236. The Court also held that a creditor who repeatedly accepts late payments must provide notice to its debtor before taking action to enforce its contractual rights through repossession. *Id.* at 237.

As an initial matter, it appears that *Cobb* has been abrogated by subsequent Minnesota legislation. *See Freeman v. Ally Fin. Inc.*, 528 F. Supp. 3d 1038, 1045 (D. Minn. 2021). But precedential value aside, Huntington's conduct here is different than the creditor's actions in *Cobb*. *Cobb* imposes a duty on a creditor to notify a debtor that strict compliance with the contract terms is required before springing a surprise repossession on the debtor, after the creditor has repeatedly accepted late payments. 295 N.W.2d at 237. That is simply not the case here. While Huntington tried to work with Galioto on multiple accommodations after Galioto continually failed to make required payments, Huntington did not repeatedly accept late payments and then spring a surprise repossession on Galioto without notice. Rather, the record confirms there was no pattern of Galioto making, and Huntington accepting, late payments. (*See* ECF No. 34 ¶¶16, 18, 32, 34, 40–42.) And Huntington provided Galioto with written notice of default prior to any repossession efforts. (ECF No. 34 ¶¶33–46.) That Huntington continued to be open to working out a solution with Galioto, even after Galioto failed to supply promised documentation and payments, did not preclude Huntington from enforcing its rights. *Cobb*, even if still viable, does not apply here. Galioto's estoppel defense fails.

### 3. Galioto's Offset Defense Does Not Preclude Summary Judgment.

Galioto next defense is based on its claimed right to offset against any amount due Huntington for breach of contract. Galioto contends any damages awarded in Huntington's favor must be reduced to reflect damages due Galioto on its illegal repossession claim against Huntington. (ECF No. 17 at 5; ECF No. 33 at 8.) In response, Huntington argues that the damages

sought by Galioto are not for the breach of the same contract, and, under Minnesota law, this prevents Galioto from offsetting as a matter of right. (ECF No. 26 at 15.) Galioto counters that because Huntington "only had the right to repossess the truck because of the contract between the parties," the damages clearly arise from the same contract. (ECF No. 33 at 8.) Both parties' arguments are sparing on legal citations and explanation.

Setoff is both a legal and equitable concept, and "[p]leading of a setoff generally admits plaintiff's cause of action." *O'Brien v. Kemper*, 149 N.W.2d 487, 491–92 (Minn. 1967); *see also Offset*, Black's Law Dictionary (11th ed. 2019). Minnesota's version of the Uniform Commercial Code allows a party who breaches a contract to "deduct all or any part of the damages *resulting from any breach of the contract*" once it notifies the other party. Minn. Stat. § 336.2-717 (emphasis added). The statute also requires that the deduction comes "from any part of the price *still due under the same* contract." *Id.* (emphasis added); *see also Jurek v. Thompson*, 241 N.W.2d 788, 794 (Minn. 1976); *Teeman v. Jurek*, 251 N.W.2d 698, 702 (Minn. 1977) ("This court held that since [Minn. Stat. § 336.2-717] makes the right of setoff available only when the claimed damages result from a breach of the same contract . . . .").

As an equitable doctrine, courts may allow setoff at their discretion. *Junak v. John*, 420 N.W.2d 668, 669 (Minn. Ct. App. 1988). Minnesota courts caution that equitable setoff should not be applied if injustice would result. *Hogren v. Schlueter*, 355 N.W.2d 762, 764 (Minn. Ct. App. 1984) (citing *Lundberg v. Davidson*, 72 N.W. 71 (Minn. 1897)). Historically, "equity jurisprudence generally did not allow tort claims to be set off against unrelated contract claims." *O'Neill v. Leonard, O'Brien, Wilford, Spencer & Gale, Ltd. (In re O'Neill)*, Nos. 4-95-1477, 4-97-001, 1997 WL 615661, at *5 (Bankr. D. Minn. Oct. 2, 1997) (collecting cases). But this legal distinction is increasingly ignored outside of litigation. *See id.*; *Cont'l Res., Inc. v. Northland Royalty Corp.*, No. 1:17-cv-00227, 2022 WL 5179845, at *7 (D.N.D. Aug. 15, 2022); *Hormel Foods Sales, LLC v. Ship Side Food Serv., Inc.*, 16-CV-1596 (LDH) (PK), 2017 WL 9732058, at *4 (E.D.N.Y. Sept. 29, 2017) (interpreting Minnesota law).

Huntington's agent's behavior in repossessing the collateral, if proved, was not a breach its contract with Galioto. Rather, as Galioto has alleged, that conduct might give rise to claims for breach of the Uniform Commercial Code or negligent training/supervision. (*See* ECF No. 1-11.) Under Minnesota law, Galioto is therefore not entitled to legal offset of its statutory or tort damages against Huntington's contract damages. *See Jurek*, 241 N.W.2d at 794.

This leaves Galioto to argue for equitable setoff. But the Court declines to apply the doctrine here. While it may be appropriate for efficiency purposes to allow setoff at the final resolution of this case *if* Galioto prevails on its claims concerning the circumstances of the repossession, the Court will not allow it to invoke the doctrine of equitable offset to defeat Huntington's summary judgment motions. The record confirms Galioto's clear and undisputed breaches of contract and it would not be equitable to delay resolution of Huntington's contract claims on this record. The Court will entertain the potential for Galioto to set off any damages it recovers on its claims "to net out liquidated cross-running claims for a final consolidated judgment." *See Polaroid Corp. v. PNY Techs., Inc. (In re Polaroid Corp.)*, 529 B.R. 887, 901 (Bankr. D. Minn. 2013).

### 4. Galioto Has Not Shown that the Private Sale of the 2019 Kenworth Truck in Connection to Contract 8-504 Was Unreasonable.

Finally, Galioto opposes summary judgment on grounds that Huntington's private sale of the 2019 Kenworth truck for $73,000 was unreasonable given Galioto's purchase of the vehicle for $119,997.69 two years earlier.[6] Commercial reasonability is governed by Minnesota's version of the Uniform Commercial Code. The relevant statute provides that "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all the collateral in its present condition or following any commercially reasonable preparation or processing." Minn. Stat. § 336.9-610(a). Commercially reasonable means that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." § 336.9-610(b). A party may dispose of collateral in public or private proceedings. *Id.*; *Ford Motor Credit Co. v. Russell*, 519 N.W.2d 460, 465 (Minn. Ct. App. 1994). And "[a]llegations that a better price could have been obtained through a different method of sale alone . . . are not sufficient to raise a factual issue as to commercial reasonableness." *Russell*, 519 N.W.2d at 465.

The burden of proof rests first on the secured party to show commercial reasonableness. *Karlstad State Bank v. Fritsche*, 374 N.W.2d 177, 181 (Minn. Ct. App. 1985) (citing *Chemlease Worldwide Inc. v. Brace, Inc.*, 338 N.W.2d 428, 437 (Minn. 1983)). The seller must show that it

---

[6] Galioto's challenge to the sale price sounds like a complaint about Huntington's failure to mitigate. A choice to sell collateral "does not constitute a failure in [a party's] duty to mitigate damages." *U.S. Bank Equip. Fin. v. Windy City Drilling, Inc.*, No. 19-CV-2291, 2021 WL 2601072, at *3 (C.D. Ill. Apr. 26, 2021) (interpreting Minnesota law). The choice to sell collateral actually shows an attempt to mitigate damages, and whether that sale was commercially reasonable is "helpful in determining mitigation of damages issues." *Duetz-Allis Credit Corp. v. Jensen*, 458 N.W.2d 163, 166 (Minn. Ct. App. 1990). Because, as will be discussed below, Huntington's sale was commercially reasonable, Galioto's challenge to the sale price is without merit.

disposed of the collateral in compliance with the statute, but, once that showing is made, commercial reasonableness is presumed. *AB Tours LLC v. ABC Bus Leasing, Inc.*, No. 21-cv-1376 (ECT/BRT), 2022 WL 3701404, at *4 (D. Minn. July 28, 2022). The burden then shifts to the contesting party to provide "specific evidence of commercial unreasonableness in method of sale" to prevent a grant of summary judgment. *Russell*, 519 N.W.2d at 466.

Huntington contends that the record shows that its liquidation of the collateral was commercially reasonable. It has proffered evidence that it sent notice of disposition to Galioto on April 14, 2021, confirming its intent to sell the truck within ten days and noting that Galioto had a right to an accounting of the unpaid indebtedness. (ECF No. 37 at 7–8; ECF No. 38-1.) It then advertised the sale on multiple online databases, as per its standard practice. (ECF No. 40 at 3.) After receiving six offers for the truck, ranging from $62,500 to $71,500, it counter-offered all potential buyers (except for the lowest bidder) at $75,000. (ECF No. 38-2.) It accepted a counteroffer for $73,000. (*Id.*) Based on these facts, Huntington has made a prima facie case under Minnesota law that its sale of the truck was commercially reasonable. *See Russell*, 518 N.W.2d at 465 (finding sale at well-recognized market in compliance with Minnesota's UCC presumed commercially reasonable); *Brace*, 338 N.W.2d at 434 (finding ten days' notice commercially reasonable).

In claiming the sale was not commercially reasonable, Galioto offers no evidence defeating Huntington's position. Instead, Galioto simply points to sales listings for other allegedly similar trucks with prices ranging from $91,900 to $118,950. (ECF No. 33 at 9.) But listings are not sales. Galioto offers no evidence that any comparable vehicles were actually sold at such prices. Galioto cannot rely on mere allegations that it might have been able to get a better price at a different type of sale proceeding. *See Russell*, 519 N.W.2d at 465. Galioto also takes issue with Huntington's failure to provide a copy of the notice of the sale, evidence demonstrating how the sale price was determined, the buyer, whether there was competitive bidding, or the value of the truck. (ECF No. 33 at 9.) Calling Galioto's bluff, Huntington supplied a copy of the notice, an explanation of its liquidation procedure, and a copy of the bids and offers received with its reply materials. (ECF Nos. 38-1 & 40.)

Galioto's laundry list of other grievances concerning the sale does not carry its burden of showing that the sale was commercially unreasonable. *See Russell*, 519 N.W.2d at 466 ("Because appellants failed to provide some specific evidence of commercial unreasonableness in the method

of sale, summary judgment was proper."); *see also Fritsche*, 374 N.W.2d at 182. Huntington has made a prima facie case of commercial reasonableness, carrying its burden and creating a presumption that the sale was reasonable. In response, Galioto has raised general grievances but has not come forward with specific evidence that would support a claim that the process was unreasonable. Accordingly, Galioto's defense fails as a bar to summary judgment.

## II. Huntington Is Entitled to Replevin.

Huntington's third claim is for replevin. Minnesota law allows for replevin, a remedy by which a prevailing party not in possession of a piece of property may either recover the property or its value where recovery is not possible. *See* Minn. Stat. § 548.04. Because, as discussed above, Galioto breached both of its contracts with Huntington and none of its affirmative defenses have merit, Huntington is entitled to replevin.

Replevin is its own cause of action in Minnesota. *See Said v. Old Home Mgmt., LLC*, No. A21-1676, 2022 WL 17748085, at *4 (Minn. Ct. App. Dec. 19, 2022). An action for replevin is appropriate when "'determin[ing] which of two contending parties is the owner' of a piece of property." *Armendariz v. Rovney*, No. 20-cv-00464 (PJS/HB), 2021 WL 4748575, at *11 (D. Minn. Oct. 12, 2021) (quoting *Widgren v. Massie*, 352 N.W.2d 420, 425 (Minn. Ct. App. 1984)). To succeed on a replevin claim, (1) "the owner [must] demand the return of property" under Minnesota Statutes Section 548.04 and (2) the person in possession of the property must refuse to deliver the property. *See Said*, 2022 WL 17748085, at *5. "[W]here the prevailing party is not in possession of the property, judgment must be entered in the alternative for the possession of the property or for its value where recovery is not possible." *Bogestad v. Bothum*, 79 N.W.2d 371, 375 (Minn. 1956). If only partial recovery is possible, then the wronged party "may have possession of the part which may be obtained and recover the value of the remainder or may elect to take judgment for the value of the whole of such property." § 548.04; *see also Schmalz v. Maxwell*, 354 N.W.2d 549, 552 (Minn. Ct. App. 1984).

Huntington seeks an order for replevin of the 2017 Dodge vehicle in connection to the 8-501 contract. (*See* ECF No. 26 at 4, 16.) The record confirms that Huntington has demanded return of the property. (*See* ECF No. 34 ¶36; ECF No. 27 at 26.) This establishes the first element for replevin. *See Said*, 2022 WL 17748085, at *5. It is also undisputed that Galioto remains in control of the property. (ECF No. 34 ¶36.) Thus, the second element, refusal to return the property, is also met. *See Said*, 2022 WL 17748085, at *5.

Galioto is largely silent on the facts or law relating to Huntington's right to replevin. It argues that Huntington should be estopped from repossessing the truck, (ECF No. 33 at 6–8), but the Court has already rejected its estoppel defense. Galioto's only other comment is that it is entitled to a trial on the claim. (*See* ECF Nos. 6, 17 & 33.) Such conclusory assertions are not sufficient to defeat summary judgment. *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter.") (quoting *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983)). Because the undisputed fact establish Huntington's right to replevin of the truck it has not already repossessed, it is entitled to summary judgment on this counterclaim, too.

### III. Huntington Is Entitled to Summary Judgment on Its Third-Party Complaint.

The Third-Party Complaint alleges that, on October 14, 2016, Bautz signed and delivered to Huntington a Continuing Guaranty. (ECF No. 13 ¶¶1, 3; ECF No. 13-1.) Huntington seeks a declaratory judgment confirming that Galioto breached the contracts and that "Bautz breached the Guaranty." (ECF No. 13 at 8.)

Huntington has produced a copy of the written guaranty, which names Galioto as the obligor, Huntington as the creditor, and Bautz as the Guarantor. (ECF No. 13-1.) It further states that:

> The undersigned ("Guarantor") hereby unconditionally and absolutely guarantees the full and prompt payment and performance when due . . . of all payments, rents, debts, liabilities, and other obligations of every type and description of Obligor to Creditor . . . now existing or hereafter arising, acquired or owed (the "Obligations"). Guarantor agrees to pay Creditor, on demand, in immediately available funds: (a) the amount of each Obligation not paid when due . . . and (b) all costs and expenses . . . incurred by Creditor in connection with the Obligations . . . .

(*Id.*) The legal significance of this continuing guaranty is largely ignored by both parties in the summary judgment briefing.

A guaranty is "a collateral contract to answer for the payment of a debt or performance of a duty in case of the default of another who is primarily liable to pay or perform the same." *Charmoll Fashions, Inc. v. Otto*, 248 N.W.2d 717, 719 (Minn. 1976). Under Minnesota law, "guaranties are effectively unilateral contracts." *U.S. Bank N.A. v. Polyphase Elec. Co.*, No. 10-4881 (DWF/LIB), 2012 WL 1394397, at *5 (D. Minn. Apr. 23, 2012) (citing *Midland Nat'l Bank of Minneapolis v. Sec. Elevator Co.*, 200 N.W. 851, 853–55 (Minn. 1924)). "Because a guaranty

is a contract, its terms must be understood in their plain and ordinary sense." *Loving & Assocs., Inc. v. Carothers*, 619 N.W.2d 782, 786 (Minn. Ct. App. 2000).

As the Guarantor, Bautz guaranteed "the full and prompt payment" of the 8-501 and 8-504 contracts to Huntington. And, as discussed above, it is undisputed that Galioto breached both the 8-501 and 8-504 contracts. Bautz thus breached the Guaranty. Bautz has waived any argument to the contrary by failing to brief the issue in opposition to summary judgment. *See Reklau v. Merchs. Nat'l Corp.*, 808 F.2d 628, 629 n.4 (7th Cir. 1986) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.") (quoting *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)). Huntington is thus entitled to summary judgment on its third-party complaint.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Huntington's motion for summary judgment, ECF No. 25, is **GRANTED**.

Dated at Milwaukee, Wisconsin on December 29, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge